FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 11, 2019

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ZIRKLE FRUIT COMPANY, a Washington Corporation, | No. 1:19-cv-03180-SMJ |
| Plaintiff, | **ORDER GRANTING PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DEPARTMENT OF LABOR; PATRICK PIZZELLA, in his official capacity as Acting United States Secretary of Labor; JOHN P. PALLASCH, in his official capacity as Assistant Secretary of Labor, Employment & Training Administration, United States Department of Labor; CHERYL M. STANTON, in her official capacity as Administrator of the Wage & Hour Division, United States Department of Labor; | |
| Defendants. | |

On September 5, 2019, the Court held a hearing on Plaintiff Zirkle Fruit Company's Motion for Temporary Restraining Order, ECF No. 4. Because the time for a temporary restraining order had passed, the Court converted the motion into one for a preliminary injunction and, with the parties' consent, heard oral argument

ORDER GRANTING PRELIMINARY INJUNCTION - 1

on that motion. At the end of the hearing the Court ruled orally, granting a preliminary injunction. This order memorializes the Court's oral ruling.

## BACKGROUND

Plaintiff Zirkle Fruit Company ("Zirkle") is a Washington farming company. ECF No. 1 at 3. One of Zirkle's primary crops is blueberries. *Id.* Each year, Zirkle harvests that crop of blueberries by hand, relying on a combination of domestic and foreign laborers. ECF No. 4 at 5. Many of those foreign laborers—2750 of them, for the 2019 blueberry harvest—arrive by way of the H-2A program, which authorizes visas for temporary agricultural workers when there is a shortage of domestic laborers in a particular region. *See* ECF No. 1 at 10; *see also Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 382 (D.C. Cir. 2018) (citing 8 U.S.C. § 1101(a)(15)(H)(ii)(a)).

To ensure that incoming H-2A laborers do not depress the wages of domestic workers employed in the same industry, H-2A employers must pay the highest of four potential wages: the adverse effect wage rate (AEWR), any collectively-bargained wage, the applicable state or federal minimum wage, or the prevailing hourly or piece wage rate (PWR). 20 C.F.R. § 655.120(a). The PWR is at issue in this case.

## A. The PWR

The PWR is intended to reflect the average wage paid to domestic laborers,

engaged in an activity like blueberry harvesting, in the agricultural region in which the H-2A employer intends to hire foreign laborers. 20 C.F.R. § 653.501(c)(2)(i). The United States Department of Labor ("DOL")—which administers the H-2A program—is ultimately responsible for setting the PWR, but states gather the data from which it is calculated. *Id.* Designated state "workforce agencies," like Washington's Employment Security Department (ESD), do this by conducting annual wage surveys. *See* ECF No. 24 at 3.

The states are guided in this process by a DOL publication known as Handbook 385, which lays out the requirements[1] for wage surveys and provides the methodology by which states calculate the PWRs. *See generally* ECF No. 1-2 at 4–50. After the state workforce agency has done so, it submits its conclusions to DOL, which reviews the information and "determines whether the survey results may be validated." ECF No. 21 at 6. If so, the PWR is published, and H-2A employers must

---

[1] Initially, the parties appeared to dispute whether Handbook 385 constitutes "requirements," *see* ECF No. 1 at 13, or merely "guidance," *see* ECF No. 21 at 6. At this point, both apparently agree that Handbook 385 definitively sets the standards governing wage surveys. This understanding of Handbook 385 is confirmed by DOL's statements outside this litigation, where the agency has proposed revisions to the Handbook. *See* 84 Fed. Reg. 36168 ("Currently, the [state workforce agencies] are required to conduct prevailing wage surveys using standards set forth in Handbook 385.") The heart of the disagreement, it seems, is the discretion afforded by Handbook 385 itself. The parties do not dispute *whether* ESD was bound by Handbook 385, but rather what Handbook 385 required it to do. Thus, because the matter is apparently undisputed, the Court refers to the standards set out in Handbook 385 as "requirements."

pay it immediately, even if the change comes mid-harvest.[2] *Id.*

### 1.     PWR for Blueberries in Washington

The PWR for blueberries is of relatively recent vintage. *See* ECF No. 23 at 4. In 2016, the first year one was published, it was $0.47/lb.; in 2017 it was $0.50/lb. with a guarantee of $9.47 per hour; and in 2018 it was $11.00 per hour. ECF No. 21 at 6. In March 2019—prior to ESD's completion of the year's wage survey— DOL approved Zirkle's application to hire 2750 foreign laborers for the blueberry harvest at a wage rate of $0.50/lb. ECF No. 4 at 9.

The 2019 PWR[3] survey was conducted by online survey, telephone calls, and forms sent through the mail.[4] ECF No. 23 at 10. Before ESD began the survey, it met with "stakeholders" in the Washington agricultural community and previewed the survey form it planned to use. ECF No. 23 at 5–6. Although Zirkle was invited to this presentation, it is unclear if it attended. *Id.* at 18–19. ESD did, however, specifically solicit Zirkle's feedback on the form of the survey, and Zirkle indicated it had no concerns. *Id.* at 7.

---

[2] If the PWR increases mid-harvest, an H-2A employer must pay the new rate immediately. 20 C.F.R. § 655.120(b). Moreover, besides filing a lawsuit like this one, an employer has no means to appeal a mid-season change to the PWR. *Id.*

[3] The data used to calculate the 2019 PWR for blueberries was collected between October 2018 and January 2019. ECF No. 23 at 7. For clarity, the Court refers to this as the 2019 PWR survey.

[4] ESD interviewed laborers in person after the survey ended, but did not include that information in setting the PWR. ECF No. 23 at 10.

Washington economist Joshua Moll oversaw the 2019 survey and calculated the updated PWR for blueberries, among other crops. *Id.* at 1–3. He estimated that 5622 laborers worked during the 2019 blueberry harvest's "peak week," or the week during which the greatest number of laborers was employed. *Id.* at 13. A total of 54 employers responded to ESD's survey, representing wage information for 1,786 domestic blueberry laborers, or roughly one-third the total estimated population. *Id.* at 12; ECF No. 24-2 at 7. Zirkle did not respond to the survey. ECF No. 23 at 17; ECF No. 31 at 12. Once the survey period closed, ESD calculated the new prevailing wage rate for blueberries as $0.75/lb. ECF No. 23 at 17. After the survey was complete, ESD again met with stakeholders and reviewed the updated PWRs. ECF No. 23 at 18–19.

ESD then reported its findings to DOL. *Id.* A DOL analyst confirmed that the sample size of ESD's survey was adequate, checked ESD's calculation of the PWR, and published the result. ECF No. 24 at 4–5. On July 24, 2019—in the seventh week of an approximately 15-week harvest, *see* ECF No. 4 at 9—DOL notified Zirkle of the increased PWR, which Zirkle was immediately required to pay. ECF No. 24-6 at 2–3.

### 2.    Procedural History

Zirkle sued DOL less than two weeks later, seeking a temporary restraining order enjoining DOL from enforcing the increased PWR. ECF Nos. 1, 4. The Court

set a hearing for five days later, but it was continued approximately three and a half weeks at the request of the parties. ECF No. 17, 26. The parties agreed to the delay because Zirkle, by agreement with DOL, began depositing the disputed wages into a trust account maintained by its counsel's law firm. ECF No. 31 at 16. DOL is concerned, however, that if the harvest ends before the case is resolved, many of Zirkle's laborers will leave the country and never be paid. *Id.* Zirkle assured the Court that because many of its workers return year after year, and because it contracts with the same recruiter in Mexico each season, it would not be difficult to locate and pay its H-2A laborers if it later loses on the merits. *Id.* Moreover, at the hearing on the preliminary injunction, Zirkle informed the Court that it had already recorded the names and mailing addresses for all H-2A employers, making it a relatively simple matter to locate them later on.

### 3. Zirkle's Claims

Zirkle claims the increased PWR is invalid because the process by which ESD calculated it was flawed. *See generally,* ECF No. 1. Specifically, Zirkle claims that in at least five ways, ESD deviated from the requirements set out by Handbook 385, and that as a result, the PWR for blueberries was artificially, and inaccurately, inflated. *Id.*

### i. Failure to Conduct In-Person Interviews

Zirkle first argues that ESD erred by conducting wage surveys utilizing the

internet, phone, and mail, rather than through in-person interviews. ECF No. 1 at 16. Handbook 385 provides that:

> All wage surveys must include a substantial number of personal employer interviews. Survey information obtained from employers may be supplemented to a limited extent by telephone or mail contacts. Under certain conditions, employer contacts by mail or by telephone may be made, in lieu of personal field contacts, but the State agency must assure itself that information gathered in this manner is representative of the rates being paid in the crop activity.

ECF No. 1-2 at 23. Zirkle contends that if ESD conducted in-person interviews, it would have been more likely to collect wage data from the largest Washington growers, like Zirkle, and therefore, the PWR would have been "substantially lower than $0.75 per pound." ECF No. 16. DOL argues that Handbook 385 gives states discretion not to conduct in-person interviews, and Mr. Moll states that telephone and online surveys are a "survey administration best practice." ECF No. 23 at 10.

### ii. Failure to Distinguish Between Crop Variety, Crop Activity, or Geographic Location

Next, Zirkle claims that ESD failed to distinguish between different categories of blueberry harvesting—for instance, between the first pick (when bushes will be densely packed) and subsequent picks (when density will be lower), or between organic and conventional blueberries. ECF No. 1 at 15. Handbook 385 states that if the wage rates "vary substantially" based on such factors, a separate

PWR should be assigned to each commodity or crop activity. ECF No. 1-2 at 14. According to Zirkle, if ESD had considered such factors, it would have calculated multiple blueberry PWRs, "in the vast majority of instances [] significantly lower than $.75 per pound." ECF No. 1 at 15. Mr. Moll, by contrast, states that he could not identify any factor that would affect the PWR for blueberries, and thus that individual PWRs were unnecessary. ECF No. 23 at 17.

Relatedly, Zirkle claims that ESD failed to account for climatic and agricultural variations between different regions in Washington, improperly setting a single, statewide blueberry PWR. ECF No. 4 at 16. Handbook 385 recognizes that individual PWRs may be necessary for different agricultural regions within a single state. ECF No. 23-3 at 3. Mr. Moll states that he did not do so because, as with different crop activities and varieties, he identified no difference in the wage rates between different Washington regions. ECF No. 23 at 17.

### iii.    Inaccurate Underlying Data

Zirkle next contends that ESD relied on inaccurate, statistically skewed data in calculating the blueberry PWR. *See* ECF No. 31 at 11. Regarding the sample size necessary to calculate a PWR, Handbook 385 dictates that if more than 3000 workers are engaged in a crop activity, the state must collect wage data representing at least 15% of that population. ECF No. 23-3 at 4. ESD estimated that 5622 laborers worked during the 2019 blueberry harvest's "peak week," and collected survey

responses representing 1786 laborers—roughly 31% of the total population, more than twice the necessary sample size. ECF No. 23 at 12–13.

Zirkle, however, claims, "on information and belief," that the data ESD used to set the blueberry PWR must have included too many small growers—which, it states, generally pay higher wages—and too few large companies. ECF No. 31 at 13. Handbook 385 states that the "wage survey sample should include workers of small, medium, and large employers." ECF No. 23-3 at 4. The survey data from which the blueberry PWR was calculated has not been produced because DOL and ESD state that it is confidential. ECF No. 23 at 25.

### iv. Improper Conversion of Pay Units

Zirkle initially argued that ESD improperly converted wage units—for instance, by equating payment by pound with payment by hour—and that this skewed the data. ECF No. 1 at 17–19. Mr. Moll states that the wage rates for blueberries were not converted, *see* ECF No. 23 at 23, and Zirkle seems to have abandoned this theory. ECF No. 21 at 15.

### v. Failure to Note PWR Increase

Finally, Zirkle claims that ESD failed to note a 50% increase in the PWR for blueberries when reporting to DOL. ECF No. 4 at 17–18. The form used to report wage survey results to DOL provides space to explain any "increase or decrease in [the] prevailing rate from [a] comparable period of [the] previous year." ECF No.

24-2 at 7. DOL states that because the PWR in 2018 was hourly, and in 2019 the PWR was per-pound, there was no "increase" to report. ECF No. 21 at 16.

## LEGAL STANDARD

### A. Preliminary Relief

Zirkle first applied for a temporary restraining order (TRO). ECF No. 4. "The underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing is held." *Hawai'i v. Trump*, 241 F. Supp. 3d 1119, 1133 (D. Haw. 2017). A TRO may only be issued for 14 days—subject to brief extension for "good cause"—until a hearing on a preliminary injunction can be held. Fed. R. Civ. P. 65(b)(2).

A preliminary injunction provides longer-term temporary relief until a case is resolved on the merits. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d at 1281, 1291 (9th Cir. 2013). To obtain a preliminary injunction, a plaintiff must generally establish four things: (1) likelihood of success on the merits, (2) that irreparable harm is likely if preliminary relief is denied, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, when the balance of equities tips "sharply" in the plaintiff's favor, preliminary injunctive relief is appropriate if there are "serious questions going to the merits," even if the plaintiff cannot necessarily establish a likelihood of success. *All. for the Wild Rockies v.*

*Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

There are two kinds of preliminary injunction: mandatory and prohibitory. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014). A mandatory injunction, which "orders a responsible party to take action," is generally disfavored and requires a heightened showing of need by the plaintiff. *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009)). By contrast, a prohibitory injunction "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Id.* "'Status quo' refers to the legally relevant relationship *between the parties* before the controversy arose." *Id.* (quoting *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)). An injunction which "prohibit[s] enforcement of a new law or policy" is prohibitory, even if the order is issued after the challenged law or policy is announced. *Id.*

## B.    The Administrative Procedures Act

Under the Administrative Procedures Act (APA), a court must invalidate "agency action, findings, and conclusions" that are "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> Review under the arbitrary and capricious standard is narrow, and [the Court does] not substitute [its] judgment for that of the agency. Rather, [it] will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or

offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). "This deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *Id.* Moreover, agency action is not arbitrary and capricious simply because it relies on a "dataset [that] was less than perfect." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 61 (D.C. Cir. 2015).

However, "[a]n agency's unannounced departure in practice from a written regulation is a distinct form of agency action that is challengeable, separate and apart from adoption of the regulation itself." *Acosta*, 901 F.3d at 387. Thus, although a plaintiff cannot obtain relief simply by showing that an agency reached an imperfect conclusion, if the agency followed a "general policy by which its exercise of discretion [was] governed, an irrational departure from that policy"— rather than "an avowed alteration of it"—may be arbitrary and capricious independent of the result it reaches. *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

## DISCUSSION

### A.     A Temporary Restraining Order is Inappropriate

The Court first denies Zirkle's request for a TRO. The time for emergency, stopgap relief had long passed by the time of the hearing. *Hawaiʻi*, 241 F. Supp. 3d at 1133. Because the issues were fully briefed, and the parties consented, the Court converted the motion into one for a preliminary injunction, and heard argument.

### B.     Zirkle Seeks a Prohibitory, Not a Mandatory, Injunction

Before turning to the merits of Zirkle's motion for a preliminary injunction, the Court must first characterize the type of injunctive relief sought. DOL argues that Zirkle is seeking a mandatory injunction because the relief it seeks would force DOL to take action by "revert[ing] back" to the $0.50/lb. PWR. ECF No. 21 at 11, n.1. DOL errs, however, in construing the "status quo" as the state of affairs *after* the increased PWR was announced. *See Brewer*, 757 F.3d at 1060. The proper status quo is the relationship between the parties "before the controversy arose." *Id.* (quoting *Hiedeman*, 694 F.3d at 1019). In this case, the operative "controversy" *is* the increased PWR, and so the Court looks to the relationship between Zirkle and DOL prior to the time the increased rate was announced—when the PWR was $0.50/lb. An injunction returning the parties to that state of affairs is prohibitory, not mandatory. *Id.* ("[L]ike other injunctions that prohibit enforcement of a new law or policy, Plaintiffs' requested injunction is prohibitory.").

**C.     Zirkle Is Entitled to a Preliminary Injunction**

Having concluded that Zirkle's request is best characterized as one for a prohibitory injunction, the Court now turns to whether one should issue. To obtain relief, Zirkle must establish either likelihood of success on the merits, or serious questions going to the merits; irreparable harm if an injunction is denied; that the balance of equities tips in its favor; and that the public interest favors preliminary relief. *Winter*, 555 U.S. at 20. After reviewing what little of the administrative record is available at this stage, the Court determines that Zirkle has established each of these four elements, and that a preliminary injunction should issue.

**1.     The Equities Tip Sharply In Zirkle's Favor**

The Court begins with the balance of equities because the outcome of this factor affects the extent to which Zirkle must establish its odds of prevailing on the merits. *See All. for the Wild Rockies*, 632 F.3d at 1135. If the equities tip "sharply" in Zirkle's favor, the Court should issue an injunction if Zirkle establishes "serious questions going to the merits." *Id.* Otherwise, it must satisfy the more onerous threshold burden of showing that it is likely to ultimately succeed on the merits. *Id.* The Court finds the balance of equities tips sharply in Zirkle's favor, and several factors influence this conclusion.

If Zirkle is forced to pay the increased PWR and later succeeds in showing that DOL was arbitrary and capricious in adopting it, it would be a hollow victory.

If the increased wages are paid, recovering them from Zirkle's non-immigrant, temporary laborers would be difficult, and perhaps impossible. More importantly, to do so would likely be Zirkle's only available recourse, because a successful APA challenge against DOL would not entitle Zirkle to collect money damages from the agency. *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998).

By contrast, if an injunction is issued—and Zirkle continues to pay the $0.50/lb. PWR, to which DOL and Zirkle's H-2A laborers agreed at the beginning of the season—it would result in little identifiable harm to the Government, and substantial, but remediable, damage to the H-2A laborers. As to DOL, while the Court recognizes that any injunction prohibiting enforcement of a government regulation results in some form of injury, here that injury is somewhat abstract and minor in comparison to Zirkle's. *See New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977). As to Zirkle's employees who will not immediately receive additional wages to which they would otherwise be entitled, the Court recognizes that this is a substantial injury. But in contrast to the financial situation facing Zirkle, this harm to its laborers can later be rectified by forcing Zirkle to pay those wages, and Zirkle has assured the Court that, because it has deposited the difference in wages into a trust account maintained by its attorneys, it will able to do so.

The Court is also struck by the apparent inequity of the manner in which the increased PWR was announced. Before the blueberry harvest began, Zirkle contracted with DOL and nearly 3000 temporary workers to ensure it had the necessary manpower for the relatively brief harvest. A basic component of that agreement was the wage Zirkle would pay—$0.50/lb. ECF Nos. 24-11; 24-15. Zirkle, as any sophisticated business would, planned around the cost of labor, and contracted with others in reasonable reliance on the assumption that if the cost changed, it would do so only modestly, as the PWR for blueberries had only increased $0.03/lb. since it was first announced in 2016. ECF No. 6 at 4; ECF No. 21 at 6. DOL then notified Zirkle—in the middle of the harvest—that the deal had changed, and it would immediately be required to pay 50% more, a substantial increase in Zirkle's costs, which it contends cannot be recovered or passed on. ECF No. 24-5; ECF No. 6 at 5–6.

In light of the above, the Court has little difficulty finding the equities tip in Zirkle's favor, and do so sharply.

## 2.    Zirkle Has Shown Serious Questions Going to the Merits

Having found the balance of equities tips sharply in Zirkle's favor, the Court next turns to whether Zirkle has shown "serious questions going to the merits" on any of its five claims. *All. for the Wild Rockies*, 632 F.3d at 1135.

### a.    In-Person Interview Requirement

Zirkle has met its burden of showing serious questions going to the merits on its claim that ESD failed to conduct the 2019 wage survey through in-person interviews as required by Handbook 385. ECF No. 4 at 14–15. As an initial matter, the fact that ESD conducted no in-person interviews is undisputed. *Id.*; ECF No. 23 at 10.

Handbook 385 assumes that wage surveys will generally be conducted via in-person interviews. *See* ECF No. 24-1 at 6. It notes, however, that under "certain conditions," mail or phone surveys[5] are permissible if the state "assures itself that information gathered in this manner" is accurate. ECF No. 24-1 at 6. The circumstances under which this exception might apply are unclear, and DOL has made no attempt to interpret this provision of Handbook 385 for the Court. Elsewhere, in proposing revisions to the PWR methodology, DOL states that Handbook 385 "*requires* in-person interviews." 84 Fed. Reg. 36185. The agency goes on to describe the in-person interview requirement as the "[m]ost burdensome" of Handbook 385's requirements, calling it "outdated" and "unrealistic given current [state workforce agency] limitations." *Id.* At oral argument, DOL reiterated this line of reasoning, arguing that insisting on in-person interviews elevates form

---

[5] The Court assumes without deciding that, under circumstances in which Handbook 385 permits phone or mail surveys, online surveys would also be permitted.

over substance.

It may well be that requiring in-person interviews is unrealistic and unnecessary in the computer age. But Handbook 385 has not yet been modernized, and, at least with respect to ESD's 2019 wage survey, DOL countenanced a wholesale departure from one of the Handbook's central requirements. *See* ECF No. 23 at 10. Because "an agency's unannounced departure in practice from a written regulation is a distinct form of agency action that is challengeable," this fact alone amounts to a cognizable APA claim. *Acosta*, 901 F.3d at 387 (D.C. Cir. 2018).

At this stage, Zirkle lacks convincing proof that ESD's failure to conduct in-person interviews resulted in an inflated PWR—in other words, evidence of causation. Zirkle contends that if ESD conducted the required in-person interviews, it would have been more likely to collect wage data from the largest Washington blueberry growers, resulting in a more accurate, and presumably lower, PWR. ECF No. 4 at 15. This argument will require a more substantial basis in evidence if Zirkle is to ultimately prevail. Even so, because the factual basis for this claim is undisputed, and Zirkle has made a plausible showing of causation, the Court finds it has shown serious questions going to the merits, and is therefore entitled to a preliminary injunction. *All. for the Wild Rockies*, 632 F.3d at 1135.

### b. Crop Variety Claim

Zirkle's next claim, that ESD failed to account for differences in crop variety,

density, or climate when setting the PWR for blueberries, has also been sufficiently established to warrant preliminary relief. ECF No. 4 at 14. At this early stage, there is little direct evidence[6] that had ESD considered such factors, it would have calculated multiple PWRs for blueberries. But this deficiency cannot be attributed entirely to Zirkle because DOL refuses to produce the survey data on which ESD relied. ECF No. 31 at 8. Thus, the Court must decide if Zirkle has shown serious questions going to the merits of this claim based on the minimal administrative record presently available. *All. for the Wild Rockies*, 632 F.3d at 1135.

The Court's review is most deferential to agency conclusions involving "the evaluation of complex scientific data within the agency's technical expertise," as is the case here. *Allen*, 615 F.3d at 1130. Mr. Moll, the ESD economist who managed ESD's 2019 wage survey, states that he was unable to identify any factor, such as climate or crop variety, that would influence the PWR for blueberries and require calculating multiple PWRs. ECF No. 23 at 17. Nevertheless, Zirkle has articulated several plausible factors that could have necessitated the calculation of multiple PWRs. ECF No. 1 at 8. Therefore, once Zirkle obtains access to the underlying survey data, it may be able to show that Mr. Moll's conclusion in this regard was so flawed as to be arbitrary and capricious. For this reason, the Court finds that

---

[6] Zirkle offers examples of how such factors can affect a blueberry laborer's efficiency, but nothing by way of direct evidence that those factors were present in the data collected by ESD. ECF No. 1 at 8.

Zirkle has met its burden of establishing serious questions going to the merits, and that a preliminary injunction is warranted. *All. for the Wild Rockies*, 632 F.3d at 1135.

### c.    Data Inaccuracy

Zirkle's third claim, that ESD relied on flawed data in calculating the PWR for blueberries, is also sufficient to warrant preliminary injunctive relief. ECF No. 4 at 18–19. The 2019 survey purportedly captured sufficient wage data to exceed Handbook 385's sample-size requirement, and Zirkle does not appear to contend otherwise. ECF No. 23-3 at 4; ECF No. 24-2 at 2. Even so, Zirkle argues, if the survey data included wage information from too many small growers paying higher wages, this could result in an inflated PWR, non-representative of what most Washington growers pay. ECF No. 31 at 13; ECF No. 1 at 22. This claim, like Zirkle's claim about crop and climate variations, lacks a clear basis in evidence because DOL has not provided the source data needed to prove or disprove it. ECF No. 31 at 8.

The Court will not set aside the updated PWR simply because it derives from a "dataset [that] was less than perfect." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 61 (D.C. Cir. 2015). But the evidence may later reveal that the wage data from which Mr. Moll calculated the PWR for blueberries was so misrepresentative that DOL's decision to certify the result "could not be ascribed to a difference in

view or the product of agency expertise," and was therefore arbitrary and capricious. *Allen*, 615 F.3d at 1130 (quoting *McNair*, 537 F.3d at 987).

As Zirkle convincingly argues, it is remarkable that the PWR for blueberries—which is supposed to reflect the average wage *actually paid* to domestic laborers—would suddenly jump 50% in the space of a year, after increasing only $.03/lb. since it was first calculated in 2016. *See* ECF No. 21 at 6. An informal survey of an agricultural trade group consisting of more than 300 employers suggests that none pays $0.75/lb. during the blueberry harvest, which only serves to confirm that the increase may be attributable to flawed data, rather than a significant shift in local labor conditions. ECF No. 10 at 2. Although this circumstantial evidence is, of course, insufficient for Zirkle to prevail on the merits of this or any of its other claims, at this stage the Court considers it in determining whether Zirkle has established a "serious question" going to the validity of ESD's survey and calculations. The Court finds that it has.

### d. Zirkle's Two Remaining Claims

Zirkle's two remaining arguments do not rise to the level of creating serious questions going to the merits. First, the record seems to clearly establish that ESD did not improperly convert between pay units in setting the PWR, and Zirkle seems to have abandoned this argument. ECF No. 1 at 18. Second, Zirkle's argument that ESD failed to note the significant increase in the PWR when reporting to DOL fails

at this stage because Zirkle has not made a convincing argument regarding causation. The gravamen of Zirkle's claim is that ESD calculated the PWR improperly—and by extension, that it was arbitrary and capricious for DOL to rely on that *calculation*. *See* ECF No. 31 at 2. Thus, whether ESD highlighted the increase is largely beside the point, and because Zirkle has failed to show how its failure to do so might have contributed to its alleged injury, it does not merit preliminary relief.[7]

### 3.    Irreparable Injury

Zirkle has shown that it will suffer irreparable harm if the new PWR is enforced. ECF No. 1 at 11. Zirkle credibly states that if it is forced to pay the additional $0.25/lb. for the remainder of this year's harvest, it will incur $1,400,000 in added labor costs. *Id.* Zirkle also credibly contends that it cannot pass these increased costs on to consumers, and that being forced to pay them would seriously harm its business. ECF No. 4 at 20. DOL argues that Zirkle's purely monetary loss is insufficient to warrant a preliminary injunction because the money can be

---

[7] This evidence could support Zirkle's argument that DOL "blindly rubber-stamped" ESD's conclusions. ECF No. 31 at 5. If substantiated, this claim could amount to arbitrary and capricious agency action. *City of New Orleans v. S.E.C.*, 969 F.2d 1163, 1167 (D.C. Cir. 1992). But Zirkle has little evidence to support it, and DOL, the party in the best position to state how closely it scrutinized ESD's data, reports that it engaged in meaningful review. ECF No. 24 at 4–5. Accordingly, at this point, Zirkle has not met its burden of showing a serious question going to the merits on this claim.

recouped, but this argument falls flat. ECF No. 21 at 20.

Once the additional wages are paid to workers, the odds of recovering them directly from those individuals are infinitesimally small. More importantly, the APA does not afford this Court jurisdiction to award monetary damages against DOL if Zirkle prevails on the merits. 5 U.S.C. § 702; *see also Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). Thus, while DOL is correct that purely monetary injury is *generally* insufficient to warrant preliminary injunctive relief, in this case, there is no "possibility that adequate compensatory or other corrective relief will be available at a later date." *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 850-51 (9th Cir. 1995) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("*Recoverable* monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." (emphasis added)). Because Zirkle has shown that the additional wages, if paid now, will be virtually unrecoverable, it has met the burden of showing that irreparable harm would result if a preliminary injunction is denied.

## 4. Public Interest

In this case, the public interest supports preliminary injunctive relief. On the one hand, the laudable goal of the H-2A program, and the PWR component of that program, is to ensure the Washington agricultural industry remains strong, and that

the addition of non-immigrant foreign laborers does not harm American farmworkers. *See Acosta*, 901 F.3d at 382. On the other hand, the public interest favors a statistically rigorous, economically accurate implementation of this important program. Accordingly, because Zirkle has made a legally sufficient initial showing that the 2019 blueberry PWR may have been artificially inflated, the public interest merits preliminary relief while the merits of its claims are resolved.

## CONCLUSION

For the foregoing reasons, the Court finds Zirkle has met the burden of showing that it is entitled to a preliminary injunction. Until the merits of the litigation are resolved or the injunction is dissolved, the parties will be bound by the $0.50/lb. PWR approved by DOL at the beginning of the blueberry harvest. Zirkle shall continue to set aside the difference in wages, as well as all applicable state and federal taxes it would otherwise be required to pay if the increased PWR were enforced. Finally, Zirkle shall compile and maintain a record of the names and mailing addresses of all H-2A blueberry laborers that may later become entitled to payment of those wages and shall inform the Court once it has done so.

Accordingly, **IT IS HEREBY ORDERED**:

1.     Plaintiff's Motion for a Temporary Restraining Order, ECF No. 4, is **CONVERTED** into a motion for a preliminary injunction, and that motion is **GRANTED**.

2. Until the litigation is resolved or the preliminary injunction is dissolved, DOL is **ENJOINED** from enforcing the $0.75/lb. prevailing wage rate announced on July 24, 2019, ECF No. 24-5.

3. Zirkle shall **CONTINUE** to pay all H-2A laborers employed in the blueberry harvest the $0.50/lb. wage DOL approved prior to the beginning of the blueberry harvest, ECF Nos. 24-11; 24-15.

4. Zirkle shall **DEPOSIT** into a trust account maintained by its counsel the difference in wages it would be required to pay if the increased PWR was enforced, as well as all applicable state and federal taxes it would be required to pay if the wages were paid to its employees.

5. Zirkle shall **RECORD** the name and permanent mailing address for all H-2A workers who may later be entitled to those wages, and shall make reasonable efforts to ensure that the information remains current. Zirkle shall **FILE** a notice of compliance with the Court once it has done so.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 11th day of September 2019.

_____
SALVADOR MENDOZA, JR.
United States District Judge